UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
ANTOINE TAYLOR,

                              Plaintiff,

        v.

NASSAU COUNTY, THE NASSAU COUNTY POLICE
DEPARTMENT, NASSAU COUNTY POLICE
COMMISSIONER LAWRENCE MULVEY, FIRST
DEPUTY COMMISSIONER ROBERT MCGUIGAN,
SECOND DEPUTY COMMISSIONER WILLIAM
FLANAGAN, ASSISTANT COMMISSIONER DAVID
MACK, ASSISTANT COMMISSIONER ROBERT
CODIGNOTTO, CHIEF OF THE DEPARTMENT
STEVEN SKRYNECKI, CHIEF OF PATROL JOHN
HUNTER, JOHN DOES COMMISSIONERS AND
SUPERVISORS, POLICE OFFICER KEITH ROGICH
AND JOHN DOE POLICE OFFICER,

                              Defendants.
------------------------------------------------------------------------ x

11-CV-0934
(SJF)(GRB)

COUNTY DEFENDANTS'
STATEMENT OF
MATERIAL FACTS
PURSUANT TO
RULE 56.1

      Defendants, the County of Nassau and Keith Rogich (hereinafter collectively referred to as the "County Defendants"), by their attorney, John Ciampoli, Nassau County Attorney, by Peter A. Laserna, submit this statement of material facts pursuant to Local Rule 56.1, as to which they contend there is no genuine issue of material fact to be tried.

## Parties

1. Antoine Taylor, the plaintiff in this matter (hereinafter referred to as "Plaintiff") is a male who was 33 years old at the time this action as commenced. See Exhibit (hereinafter referred to as "Exh.") C, Deposition of Antoine Taylor at p. 12 (birth date of Plaintiff is November 12, 1977); Exh. A, Complaint at p. 4 (filed on February 25, 2011).

2. Nassau County is a municipal corporation duly organized and existing pursuant to the laws of New York State. See Exh. X, Nassau County Charter, § 101.

3. Police Officer Keith Rogich ("Officer Rogich") has been employed by the Nassau County Police Department since 1993 and attended the Nassau County Police Academy for 6 months. Exh. B, Deposition of Keith Rogich at p. 5, 14.

4. Officer Rogich has been a member of the Bureau of Special Operations (hereinafter referred to as "BSO") since 2005. Exh. B, p. 5

1

## Procedural History

5. Plaintiff commenced this action by filing a Summons and Complaint in the Eastern District of New York on February 25, 2011. See Exh. A, Complaint at p. 4.

6. The County Defendants served an Answer and filed it with the Court on April 26, 2011. See Exh. B, County Defendants' Answer.

7. The Honorable Sandra J. Feuerstein issued an Order, directing that the County Defendants were to serve a summary judgment motion by June 25, 2012; Plaintiff was to serve a response by July 9, 2012; and the County Defendants were to serve a reply by July 19, 2012. See Minute Entry, dated April 12, 2012, docket entry (hereinafter referred to as "DE") 47.

8. The instant Rule 56.1 Statement and accompanying moving papers are served pursuant to the Individual Rules of Hon. Sandra J. Feuerstein, the Local Rules of the Eastern District of New York, and the Federal Rules of Civil Procedure.

## Non-Party Witnesses

9. Detective James Cereghino is an employee of the Nassau County Police Department who was investigating the murder of Eukapavi Hoskins on August 14, 2009, for which Plaintiff was a suspect. See Exh. E, Deposition of James Cereghino, generally.

10. Police Officer Michael Knatz is an employee of the Nassau County Police Department who participated in the arrest of Plaintiff on September 26, 2009. See Exh. F, Deposition of Michael Knatz, generally. Officer Knatz is also a member of the BSO.

11. Police Officer Dale Denehy is an employee of the Nassau County Police Department who participated in the arrest of Plaintiff on September 26, 2009. See Exh. G, Deposition of Dale Denehy, generally. Officer Denehy is also a member of the BSO.

12. Police Officer Thomas Kearney is an employee of the Nassau County Police Department who participated in the arrest of Plaintiff on September 26, 2009. See Exh. H, Deposition of Thomas Kearney, generally. Officer Kearney is also a member of the BSO.

13. Police Officer Edward Alonge is an employee of the Nassau County Police Department who participated in the arrest of Plaintiff on September 26, 2009. See Exh. Q, Deposition of Edward Alonge, generally. Officer Alonge is also a member of the BSO.

14. Sergeant Kevin McCarthy is an employee of the Nassau County Police Department who participated in the arrest of Plaintiff on September 26, 2009. See Exh. R, Deposition of Kevin McCarthy, generally. Sergeant McCarthy is also a member of the BSO.

15. Sergeant John Carney is an employee of the Nassau County Police Department who participated in the arrest of Plaintiff on September 26, 2009. See Exh. P, Deposition of John Carney, generally. Sergeant Carney is also a member of the BSO.

16. Angela Thomas lives in the area where Plaintiff was arrested on September 26, 2009. See Exh. I, Deposition of Angela Thomas, generally. Ms. Thomas observed some police activity throughout the day, but did not directly observe Plaintiff being arrested on September 26, 2009. See id.

17. Edgar Campos lives in the area where Plaintiff was arrested on September 26, 2009. See Exh. J, Deposition of Edgar Campos, generally. Mr. Campos observed some police activity through the day, but did not directly observe Plaintiff being arrested on September 26, 2009. See id.

18. Maria Jurado lives in the area where Plaintiff was arrested on September 26, 2009. See Exh. K, Deposition of Angela Thomas, generally. Ms. Jurado observed some police activity throughout the day, but did not directly observe Plaintiff being arrested on September 26, 2009. See id.

## Investigation Preceding Plaintiff's Arrest

19. Prior to his arrest, Plaintiff was wanted for questioning with regard to allegations of domestic abuse. See Exh. E, p. 11 (Detective Cereghino: "I was aware … [of] an active assault investigation out of the Third Squad on one of [Antoine Taylor's] girlfriends Cheryl Similian.").

20. During this time, Plaintiff was also wanted for questioning as a suspect in the shooting and murder of Eukapavi Hoskins, which took place on August 14, 2009. Exh. E, p. 11 (Detective Cereghino: "I wanted an opportunity to speak to [Antoine Taylor] concerning the death of Eukapavi Hoskins.").

21. Eukapavi Hoskins died on August 14, 2009. Exh. E., p. 12. Mr. Hoskins was "shot to death at the intersection of Washington Street and Nichols Court in Hempstead," New York. Id.

22. Detective Cereghino learned from confidential informants that Plaintiff may have been the shooter in Eukapavi Hoskins death. Exh. E, p. 12 (Detective Cereghino: "I was receiving information from other confidential informants that a subject by the name [of] LG had done the shooting, and that his true name was Antoine Taylor.").

23. Detective Cereghino was the detective in charge of investigating Plaintiff's involvement in the shooting death of Eukapavi Hoskins. Exh. E, p. 12.

24. Detective Cereghino wanted an opportunity to speak to Plaintiff regarding his involvement in the death of Eukapavi Hoskins. Exh. E, p. 11.

25. During the course of his investigation of this homicide, Detective Cereghino learned that there was an "open parole warrant" for Plaintiff. Exh. E, p. 11. Detective Cereghino learned of the warrant when he did a background check on Plaintiff after he received information that Plaintiff may have been involved in the murder of Eukapavi Hoskins. Id. at p. 12.

26. On September 22, 2009, Detective Cereghino received information from a confidential informant that Plaintiff frequented 152 West Graham Avenue every Friday night. Exh. E, p. 10.

27. With the information from the confidential informant, Detective Cereghino requested that member of the Nassau County Police Department conduct surveillance on 152 West Graham Avenue, Hempstead, New York on Friday, September 25, 2009. Exh. E, p. 10. They conducted this surveillance from approximately 7:00 p.m. until 1:00 a.m. Id.

28. Plaintiff never appeared at 152 West Graham Avenue on Friday, September 25, 2009. Id. at 10-11.

29. Because Plaintiff never appeared at 152 West Graham, Detective Cereghino called off the surveillance and members of the Nassau County Police Department discontinued their surveillance of 152 West Graham Avenue. Id.

30. At approximately 3:00 p.m. on Saturday, September 26, 2009, Detective Cereghino received a phone call from the same confidential informant. Id. at 11.

31. During his telephone conversation with the confidential informant on September 26, 2009, Detective Cereghino learned from the confidential informant that Plaintiff was located at 152 West Graham Avenue on September 26, 2009. See id. at 10-11.

4

32. Once Detective Cereghino learned that Plaintiff was at 152 West Graham Avenue on Saturday, September 26, 2009, he mobilized members of the Nassau County Police Department BSO in order for them to continue surveillance of the residence located at that property. See id.

33. BSO members were given this assignment in order to effectuate the arrest of Plaintiff on September 26, 2009. See Exh. R, p. 7-8.

### The Arrest of Plaintiff on September 26, 2009

34. Plaintiff was arrested by Nassau County Police Officers on September 26, 2009. Exh.U, Nassau County Police Department Arrest Report.

35. When Plaintiff was arrested by Nassau County Police Officers on September 26, 2009, there were two valid outstanding warrants directing that any police or peace officer in the State of New York was authorized and ordered to arrest Plaintiff. Exh. L, New York State Division of Parole Warrant for the Arrest of Antoine Taylor, issued on August 7, 2009; Exh. M, Village Court of Hempstead Bench Warrant for the Arrest of Antoine Taylor, dated August 13, 2009.

36. Officer Rogich was one of the BSO officers assigned to assist in the apprehension and arrest of Plaintiff on September 26, 2009. See Exh. D, p. 43.

37. Prior to his interaction with Plaintiff, Officer Rogich was aware of the outstanding warrant issued by the New York State Division of Parole. Exh. D, p. 10.

38. Prior to his interaction with Plaintiff, Officer Rogich was personally aware of the fact that Plaintiff was wanted in connection with the shooting and death of a person in Hempstead. Exh. D, p. 32-33 (Officer Rogich: The BSO received an assignment on September 26, 2009 to "assist the homicide squad and join in" an investigation of Antoine Taylor); p. 33 (Officer Rogich: The Homicide Squad "believed [Antoine Taylor] was the person who had done the homicide in Hempstead.").

39. The BSO was assigned to arrest Plaintiff because they are the tactical unit of the Nassau County Police Department. See Exh. D, p. 5. The BSO is also utilized to execute arrest warrants. See Exh. G, p. 7.

40. The arrest of Plaintiff was considered a dangerous situation that warranted the use of BSO. See Exh. D, p. 44-45.

5

41. Prior to Plaintiff's arrest, the BSO was informed that Plaintiff was "armed with a nine-millimeter handgun." Exh. P, p. 9.

42. Prior to Plaintiff's arrest, Officer Rogich was personally aware of the fact that Plaintiff may have been armed with a nine-millimeter handgun on September 26, 2009. Exh. D, p. 61-62 (Officer Rogich: "The confidential informant had told homicide, which they relayed to us, that Mr. Taylor has been known to carry a weapon, a / nine-millimeter handgun."); see also p. 52.

43. Prior to Plaintiff's arrest, the BSO was informed that Plaintiff was a gang-member with the "Outlaws" gang. Exh. P, p. 9-10.

44. Prior to Plaintiff's arrest, the BSO was informed that Plaintiff had threatened to kill his parole officer. Exh. P., p. 9.

45. Prior to Plaintiff's arrest, the BSO was informed that Plaintiff had a "violent past," which included a domestic incident. Exh. P., p. 9.

46. Prior to Plaintiff's arrest, the BSO was informed that Plaintiff was an "absconder from [P]arole," meaning that he was deliberately evading the authorities. Exh. D, p. 59.

47. Prior to Plaintiff's arrest, Plaintiff himself was also fully aware of the "fact" that the Nassau County Police Department wanted to question him with regard to his involvement in the death of Eukapavi Hoskins. Exh. C, Deposition of Antoine Taylor, p. 224 (*Question*: "So you were under the belief that you may have been wanted [by law officials] for questioning with regard to Mr. [Hoskins] death…" *Answer*: "That's not a belief. That's a fact.").

48. On September 26, 2009, as part of the plan to arrest Plaintiff, the vehicle Officer Rogich was in was assigned to the corner of West Graham Avenue and Rose Avenue, in Hempstead New York. See Exh. D, p. 42-43.

49. The intersection of West Graham Avenue and Rose Avenue, in Hempstead, is located approximately a block and a half east of 152 West Graham Avenue, where Plaintiff was located prior to his arrest. Exh. D, p. 49; Exh. GG.

50. West Graham Avenue travels in an east-west direction. Exh. GG.

51. Rose Avenue travels in a north-south direction. Exh. GG.

52. Rose Avenue and West Graham Avenue, in Hempstead, New York, are two streets that intersect with one another. Exh. GG.

53. Officer Rogich's partner at the time, Police Officer Michael Knatz, was driving the vehicle that Officer Rogich was in. Exh. D, p. 50.

54. Officer Knatz parked their vehicle on Rose Avenue. Exh. D, p. 50. They were parked on the northwest corner of the intersection of West Graham Avenue and Rose Avenue. Id.; see also Exh. GG.

55. Originally, the plan to arrest Plaintiff on September 26, 2009, while he was located at 152 West Graham was to wait until he left the house, went to his car, drove his car out through the driveway, block him from leaving the driveway with a police vehicle, and arrest him while he was in his car. Exh. D, p. 52.

56. However, the plan to apprehend Plaintiff had to be modified because a BSO officer conducting surveillance on 152 West Graham Avenue observed that there were little children in the area surrounding the residence at 152 West Graham Avenue. See Exh. D, p. 52-53.

57. Because there were children and other innocent bystanders in the area surrounding 152 West Graham Avenue, the BSO "supervisors decided the best thing to do would be … to stop [Plaintiff] away [152 West Graham Avenue], … where there is less chance … of any accidents or any innocent bystanders getting hurt." Id. at 53.

58. Essentially, the BSO determined that it would be best to avoid the possibility that a shootout would occur if they attempted to arrest Plaintiff on the property of 152 West Graham Avenue. Exh. D, p. 52.

59. However, the police still planned to take Plaintiff into custody "without any resistance [or] any violence." Exh. D, p. 52.

60. Sergeant Kevin McCarthy, a BSO supervisor, formulated the plan of waiting until Plaintiff left the residence at 152 West Graham Avenue to "pull him over and arrest him, assuming he left in the vehicle, and if he left on foot, the same thing would happen." Exh. R, p. 14. In order to pull him over, the plan involved barricading Plaintiff's car on the street with police vehicles. See id. at 14-15.

61. The plan to block Plaintiff in with police vehicles was to take place on West Graham Avenue. See Exh. D, p. 59-68.

62. However, the BSO did not know which direction Plaintiff would travel on West Graham Avenue after he left 152 West Graham Avenue. Exh. D, p. 66-67.

7

63. A perimeter was formed around the area of 152 West Graham. See Exh. D, p. 66-67. This perimeter was formed so that Plaintiff could be pulled over whether he went east or west on West Graham Avenue. Exh. R, p. 33; see also Exh., p. 66-67.

64. If Plaintiff traveled east on West Graham Avenue, then he would have been pulled over before he crossed the intersection of West Graham Avenue and Rose Avenue. See Exh. D, p. 66-68.

65. Plaintiff was to be pulled over by surrounding his car and preventing him from leaving the intersection of West Graham Avenue and Rose Avenue. Exh. R, p. 14-15.

66. Barricading Plaintiff's car was to be effectuated with several police cars. Exh. R, p. 14-15.

67. Plaintiff did, in fact, travel east on West Graham Avenue after leaving 152 West Graham Avenue. See Exh. D, p. 64.

68. The plan to effectuate Plaintiff's arrest was initiated at approximately 6:15-6:30 p.m., when Plaintiff left the house at 152 West Graham Avenue. See Exh. D, p. 55-56, 63-64.

69. When Plaintiff left 152 West Graham, Police Officer Brian O'Connor, who was the lookout for 152 West Graham, communicated over the radio to the rest of the BSO offices in the area that Plaintiff "was leaving in a Mitsubishi and … heading in the direction … the intersection of Rose Avenue and West Graham." Exh. D, p. 63, l. 10-19.

70. This meant that Plaintiff was traveling in an easterly direction on West Graham Avenue. Exh. D, p. 64.

71. After Officer Rogich and his partner, Police Officer Michael Knatz, received information that Plaintiff was traveling towards them, Officer Knatz slowly pulled his police vehicle into the intersection of West Graham Avenue and Rose Avenue. Exh. D, p. 67.

72. Officer Knatz pulled into the intersection as Plaintiff was making a stop at the intersection. Exh. D, p. 67. Plaintiff was stopped at a stop sign on West Graham Avenue. Id.

73. Officer Knatz and Officer Rogich's vehicle did not have their lights on at this time. Exh. D, p. 67.

74. Instead, Officer Knatz pulled into the intersection and drove as though he was going to make a 3-point turn in order to drive back in the direction that he came from. Exh. D, p. 67-68; Exh. F, p. 31-33.

8

75. After he drove into the intersection, Officer Knatz stopped his vehicle in front of Plaintiff, who was stopped at the stop sign on West Graham Avenue. Exh. D, p. 67-68. Office Knatz was continuing the ruse that he was simply making a 3-point turn, or U-turn, in the intersection. See id.

76. Officer Knatz and Officer Rogich waited until the other police cars involved in the plan converged and surrounded Plaintiff's car. Exh. D, p. 68.

77. Within moments of Officer Knatz pulling into the intersection, the other police cars did, in fact, surround Plaintiff's car. See Exh. D, p. 68.

78. Once the other police cars surrounded Plaintiff's car, Officer Knatz turned on his vehicle's "emergency lights." Exh. D, p. 68; Exh. R, p. 35.

79. These emergency lights are "flashing emergency lights that … flash. There [are] red flashing lights in the dashboard. There are lights in the rear. The side lights strobe." Exh. D, p. 68.

80. All of the police officers who testified in this matter agree that they had their emergency lights on when they surrounded Plaintiff's car. Exh. Q, Deposition of Edward Alonge, p. 65-66 (*Question*: And when for the first time did the lights on your vehicle go on? *Answer*: … I believe it was within the last four or five car lengths before we stopped, somewhere in that vicinity, as we got closer to" Plaintiff. *Question*: The lights on your vehicle went on, prior to the time that your vehicle came to a stop? *Answer*; That is correct.); Exh. R, p. 50-51 (Sergeant McCarthy testified that he turned on his emergency lights as he entered the intersection of West Graham Avenue and Rose Avenue.).

81. After Plaintiff was surrounded by at least 4 police cars with their emergency lights on, Officer Rogich exited his car. Exh. D, p. 68, p. 70-71 (Officer Rogich: "Now when the backup cars arrived, all the cars that were there, all the police cars that were there, turned on their emergency lights. It was like a Christmas tree. That's when I exited the police car."); Exh. Q, p. 65.

82. When Officer Rogich exited his car, facing the front of Plaintiff's car, he had his police badge displayed. Exh. D, p. 77 (Officer Rogich testified that he had his police badge displayed around his neck.); see also Exh. R, p. 95-96 ("*Question*: Were you able to see if [Officer Rogich] had his badge displayed? *Officer Alonge Answer*: He had his badge out on his neck. *Question*: You were able to see it? *Officer Alonge Answer*: Yes.").

9

83. When Officer Rogich exited his car, he was approximately 10-12 feet in front of Plaintiff's car. Exh. D, p. 72 (Officer Rogich: "Approximately around 10 feet."); Exh. R, Deposition of Kevin McCarthy ("*Question*: When Mr. Taylor's vehicle was at a stop, was the front of his vehicle less than 12 feet away from [Officer Rogich's vehicle]? *Sergeant McCarthy Answer*: Very close to it…").

84. When Officer Rogich exited his car, he also had his gun drawn. Exh. D, p. 77.

85. Officer Rogich had his gun drawn because Plaintiff was thought to be dangerous. Exh. D, p. 78. Officer Rogich had information that Plaintiff was an absconder from parole, that he was a suspect in a shooting homicide, and that he was possibly armed. Id.

86. After Officer Rogich exited his car, he yelled to Plaintiff that he was the police. Exh. D, p. 79. Officer Rogich also testified that he yelled to Plaintiff either "stop" or "don't move." Id.

87. As Officer Rogich exited his car, Plaintiff immediately went in reverse. Exh. D, p. 80.

88. Plaintiff traveled approximately 5-12 feet in reverse. Exh. D, p. 80 (Officer Rogich testified that it was approximately 5 feet); Exh. R, p. 53 (Sergeant McCarthy testified that Plaintiff had over 12 feet of room behind him to reverse.).

89. After Plaintiff drove in reverse, he stopped for a "split second." Exh. R, p. 55; see also Exh. D, p. 85.

90. Then Plaintiff shifted to drive and accelerated towards Officer Rogich. Exh. D, p. 82; Exh. Q, p. 75-82.

91. At this point, Officer Rogich feared for his life. Exh. D, p. 85 (Officer Rogich: "I will tell you this much, he was going fast enough that I was in fear for my life.").

92. Officer Rogich felt that the Plaintiff "was going fast enough that if there wasn't some kind of intervention that [he] was going to be run over." Exh. D, p. 86.

93. As Plaintiff was accelerating toward Officer Rogich with his car, Officer Rogich shot at him 3 times. Exh. D, p. 90.

94. Officer Rogich aimed for Plaintiff's "center mass," meaning the center of his body. Exh. D, p. 91.

95. The reason Officer Rogich shot at Plaintiff was to "[s]omehow get [Plaintiff] to stop or to not get run over." Exh. D, p. 92.

96. Officer Rogich shot 3 times in an attempt to force Plaintiff to stop the car, so that Officer Rogich wouldn't be run over. Exh. D, p. 92.

97. One of the bullets struck Plaintiff on the right side of his abdomen. Exh. A, ¶ 75.

98. As Officer Rogich was shooting at Plaintiff, he attempted to move out of the path of Plaintiff's car. Exh. D, p. 92 (Officer Rogich: "Once I saw him coming, coming toward me, I stopped. Now I'm moving out of the way, but I'm not fast enough.").

99. As Officer Rogich was attempting to move out of the way of Plaintiff's car, he was under the belief that he would not be fast enough to clear the path and that he would end up being run over. Exh. D, p. 92.

100. Officer Rogich was forced to shoot at Plaintiff's car as he moved out of the way because he believed that without "some kind of intervention" he would have been run over. Exh. D, p. 95.

101. Fortunately, Plaintiff's car did not strike Officer Rogich. Exh. D, p. 96. Officer Rogich was able to move to his left until he reached the sidewalk, where he fell. Id.

102. After Plaintiff was shot, he was able to maneuver through the police cars that surrounded him. Plaintiff did this by veering his car to the right (Exh. R, p. 59) and driving around Officer Rogich and Knatz's vehicle (Exh. F, p. 70).

103. Once Plaintiff maneuvered passed the police vehicles, Officer Knatz began to follow him in his vehicle. Exh. F, p. 82.

104. After Plaintiff's vehicle began leaving that area, two other officers, Dale Denehy and Thomas Kearney, arrived on the scene. Exh. H, Deposition of Thomas Kearney, p. 24.

105. The fact that Plaintiff was evading arrest prompted Officers Denehy and Kearney to turn on their police lights and sirens while they were some distance away. Exh. H, p. 23-24.

106. They were in a Ford, Crown Victoria, driven by Officer Denehy. Exh. H, p. 13, 18.

107. Plaintiff was traveling at a "high rate of speed" as he fled that scene. Exh. H, p. 24.

108. Officers Denehy and Kearney followed Plaintiff as he fled that scene. Exh. H, p. 35.

109. Originally, Officer Knatz was the car leading the pursuit of Plaintiff. See Exh. F. However, Officers Denehy and Kearney eventually overtook his car because their car could travel faster than Officer Knatz's, which was an SUV. See Exh. H, p. 36.

11

110. As Plaintiff was attempting to evade arrest, Officer Kearney estimated that he was traveling "between 60-80 miles an hour" in the residential area of Hempstead, New York. Exh. H, p. 38.

111. Plaintiff drove "recklessly" for several miles, including passing through intersections in a manner that was described by Officer Kearny as "blindly." Exh. H, p. 67.

112. This also included Plaintiff driving through a red light at the "busy intersection" of West Graham Avenue and South Franklin Street, in Hempstead. Exh. G, Deposition of Dale Denehy, p. 34.

113. The high-speed chase terminated when Plaintiff crashed into a tree stump on the corner of Baldwin Road and Downs Road. See Exh. H, p. 37-38; see also Exh. GG.

114. After Plaintiff crashed, he exited his vehicle and ran eastbound on Downs Road. Exh. H, p. 40.

115. Officers Denehy and Kearney exited their vehicle and ran after Plaintiff. Exh. H, p. 42-43.

116. They both directed the Plaintiff to "Stop!" and yelled that they were the police. Exh. H, p. 45; Exh. G, p. 39. Plaintiff never stopped. See Exh. G, p. 40.

117. Instead, the two police officers caught up with Plaintiff in a residential backyard about 2 or 3 houses from where Plaintiff crashed and tackled him. Exh. H, p. 43-45.

118. After tackling him, Officer Kearney ordered Plaintiff to "Stop. Put your hands behind your back. Stop resisting." Exh. H, p. 47.

119. Plaintiff refused to stop resisting and he continued to flail his arms and legs in an attempt to resist arrest. Exh. H, p. 47-48.

120. Eventually, Officer Knatz arrived and helped Officers Denehy and Kearney arrest Plaintiff. Exh. F, p. 82; Exh. H, p. 47-48. Officer Knatz handcuffed Plaintiff as all 3 officers were able to put his hands behind his back. Exh. F, p. 82; Exh. H, p. 47-48.

121. This altercation took longer than a minute, despite the fact that Plaintiff had a gun wound. Exh. H, p. 49-50.

122. After he was placed under arrest, Plaintiff informed the officers that he had been shot. Exh. H, p. 49.

123. This prompted Officer Knatz to call for medical attention for Plaintiff. Exh. F, p. 89; Exh. G, p. 41.

124. Prior to the ambulance arriving, Detective Cereghino arrived on the scene where Plaintiff was under arrest. Exh. E, p. 21-22.

125. When Detective Cereghino identified himself, Plaintiff spontaneously said to him "It wasn't my fault. It was [Eukapavi's], it was [Pav's] gun." Exh. E, p. 22.

126. Detective Cereghino took this to mean that Plaintiff knew he was being sought in connection with the death of Mr. Hoskins, and read Plaintiff his *Miranda* rights before Plaintiff made any more spontaneous confessions. Exh. E, p. 22.

127. Plaintiff was then taken to Nassau University Medical Center. See Exh. U, Nassau County Police Department Arrest Report.

128. Plaintiff was charged with Attempted Murder in the First Degree, based on his attempt to run over Officer Rogich, Violation of Parole, based on warrant for arrest, and a Vehicle and Traffic Law Violation, based on warrant for arrest. Exh. U, Nassau County Police Department Arrest Report, Arrest on 9.26.09.

129. Plaintiff was also arrested on November 25, 2009, based on the continued investigation of Detective Cereghino. He was charged with Second Degree Murder for the death of Eukapavi Hoskins on August 14, 2009. Exh. V, Arrest on 11.25.09.

130. On December 8, 2010, Plaintiff plead guilty to Reckless Endangerment in the First Degree, New York Penal Law § 120.25, a Class D Felony, and Manslaughter in the First Degree, New York Penal Law § 125.20, a Class B Felony. Exh. O, Certificate of Disposition; Exh. N, Transcript of the Allocution of Antoine Taylor for his Criminal Convictions, Taken on 12.8.10.

Dated: Mineola, New York
       June 25, 2012

                                        John Ciampoli
                                        Nassau County Attorney
                                        By:      /s/
                                                  Peter A. Laserna
                                                  Deputy County Attorney
                                                  (516) 571-2999
                                                  *Attorney for the County Defendants*

To:     John J. Nonnenmacher, Esq.
           Bader, Yakaitis & Nonnenmacher, LLP
           Empire State Building
           350 Fifth Avenue, Suite 7210
           New York, NY 10118
           (212) 465-1110
           jnonnenmacher@bynlaw.com